**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LORI S. MOTT, VICTORIA BATES, CYNTHIA
COTTEN, SUSAN GIBBS, SUSAN MOORE, and
JUDY RATLIFF, on behalf of themselves and all
others similarly situated,

                            Plaintiffs,            CIVIL ACTION

      v.

DRIVELINE RETAIL MERCHANDISING INC., a      No. 2:12-CV-05244 AB
Corporation,

                    Defendant.


**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY**
**THE CONDITIONALLY CERTIFIED CLASS UNDER THE COLLECTIVE**
**PROVISIONS OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 216(b),**
**WITH SUPPORTING EXHIBITS**


PAUL, REICH & MYERS, P.C.
Richard P. Myers, Esq.
Suite 500, 1608 Walnut Street,
Philadelphia, PA  19103
215-735- 9200

Attorneys for Plaintiffs

# Table of Contents

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................4

    DRIVELINE'S MERCHANDISER POLICIES..................................................................4
    PLAINTIFFS' MERCHANDISING WORK & THEIR CLAIMS ..........................................8

ARGUMENT ........................................................................................................................13
I.   THE PLAINTIFFS IN THIS COLLECTIVE ACTION ARE SIMILARLY
    SITUATED BECAUSE THEY ALL PERFORMED THE SAME JOB IN THE
    SAME WAY FOR DRIVELINE, AND THEY WERE SIMILARLY DENIED PAY
    BASED ON DRIVELINE'S PAY POLICIES AND WORK PRACTICES THAT
    OPERATED IN VIOLATION OF THE FLSA.......................................................................13

    A.  Plaintiffs are similarly situated because they all performed the same job in the
        same way based a single Driveline Merchandiser Position Description. ..........................16
    B.  The time Plaintiffs worked on Driveline's behalf performing administrative tasks
        and traveling from job site to job site during the workday are compensable under
        the FLSA.........................................................................................................................19

        1.  The administrative work that Plaintiffs performed on Driveline's behalf was
            compensable under the FLSA because it was integral and indispensable to
            their principal merchandising activities. ....................................................................19

        2.  The time Plaintiffs spent traveling from job site to job site during each
            workday was compensable under the FLSA pursuant to the continuous
            workday rule. ..............................................................................................................21

    C.  Driveline's Pay Policy and Work Practices operated in violation of the FLSA,
        thereby denying Plaintiffs pay for work they performed for Driveline on required
        administrative tasks and for time they spent traveling from job site to job on
        Driveline's behalf during the workday. ..........................................................................23

    D.  Individual defenses and procedural considerations do not weigh against collective
        adjudication of the critical issue in this case – whether Driveline's pay policy and
        work practices caused Plaintiffs to be denied pay in violation of the minimum
        wage and overtime provisions of the FLSA. ..................................................................26

        1.  Individual Defenses .....................................................................................................26

        2.  Fairness and Procedural Considerations .....................................................................30

CONCLUSION.....................................................................................................................31

# Table of Authorities

## Cases

Anderson v. Mt. Clemens Pottery, 328 U.S. 680, 66 S. Ct. 1187,
90 L. Ed. 1515 (1946) ........................................................................................ 19, 25

Andrako v. United States Steel Corp., 788 F. Supp. 2d 372
(W.D. Pa. 2011) .................................................................. 14, 15, 16, 27, 28, 30

Aquilino v. Home Depot, Inc., 2006 U.S. Dist. LEXIS 66084
(D. N.J. September 7, 2006) ............................................................................ 21

Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342 (N.D. Ga. 2002) .......................... 30

De Asencio v. Tyson Foods, Inc., 500 F.3d 361 (3d Cir. 2007) ............................................. 22, 17

Frank v. Gold'n Plump Poultry, Inc., 2007 U.S.Dist. LEXIS 71179 (D. Minn. 2007) ................ 27

Hill v. Muscogee Sch. Dist., 2005 U.S. Dist. LEXIS 35725 (M.D. Ga. 2005) ........................... 28

Integrity Staffing Solutions, Inc. v. Busk, 113 S. Ct 513 (2014) ......................................... 15, 17

Jordan v. IBP, Inc., 542 F. Supp. 2d 790 (M.D. Tenn. 2008) ............................................... 27

Kautsch v. Premier Commc'ns, 2008 U.S. Dist. LEXIS 7219 (W.D. Mo. 2008) ...................... 30

Lugo v. Farmer's Pride, 2008 U.S. Dist. LEXIS 17565
(E.D. PA March 7, 2008) ................................................................................ 14, 15

Lusardi v. Xerox Corp., 118 F.R.D. 351 (D.N.J. 1987) ...................................................... 15, 17

Martin v. Citizens Fin. Group, Inc., 2013 U.S. Dist. LEXIS43084 (E.D. Pa. 2013) .............. 14, 15

Moss v. Crawford & Co., 201 F.R.D. 398 (W.D. Pa. 2000) ............................................ 15, 16, 27

Myers v. Hertz Corp., 624 F.3d 537 (2d Cir. 2010) ........................................................... 14

Plewinski v. Luby's Inc., 2010 U.S. Dist. LEXIS 39179 (S.D. Tex. 2010) .......................... 15, 17

Ruti v. LoJack Corp., 596 F.3d 1046 (9th Cir. 2010) .......................................................... 23

Steiner v. Mitchell, 350 U.S. 247, 76 S. Ct. 330, 100 L. Ed. 267 (1956) .................................. 20

Symczyk v. Genesis Healthcare Corp., 665 F.3d 189 (3d Cir. 2011) .................................. 13, 12

<u>Tennessee C., I. & R. v. Muscoda</u>, 321 U.S. 590, 64 S. Ct. 698,
88 L. Ed. 949 (1944) ................................................................................. 19

<u>Wilks v. Pep Boys</u>, 2006 U.S. Dist. LEXIS 69537 (M.D. Tenn. 2006) ................................ 27, 30

<u>Williams v. Owens & Minor, Inc.</u>, 2009 U.S. Dist. LEXIS 102304
(E. D. PA Oct. 9, 2009) .............................................................................. 12

<u>Williams v. Tri-County Growers</u>, 747 F.2d 121 (3d Cir. 1984) .................................. 23

<u>Woodward v. Fed Ex Freight East, Inc.</u>, 250 F.R.D. 178, (M.D. PA 2008) ............................... 13

<u>Zavalla v. Wal-Mart Stores, Inc.</u>, 2010 U.S. Dist. LEXIS 63530 (D.N.J. 2010) .................... 15, 17

<u>Zavalla v. Wal-Mart Stores, Inc.</u>, 691 F.3d 527 (3d Cir. 2012) ....................................... 14, 15, 16

**Statutes**

29 U.S.C. § 206 ................................................................................................ 1, 13

29 U.S.C. § 207 ................................................................................................ 1, 13

29 U.S.C. § 216 ............................................................................................... 1, 13, 14

**Regulations**

29 C.F.R. § 516.6 ............................................................................................. 19

29 C.F.R. § 778.223 ......................................................................................... 19

29 C.F.R. § 790.6 ............................................................................................. 22

**INTRODUCTION**

The 1,692 former and present Driveline employees who comprise this collective action under the Fair Labor Standards Act ("FLSA") are all similarly situated because they all performed the same merchandising work in the same way based on a single Driveline Merchandiser Position Description.  Plaintiffs are also similarly situated because all performed required administrative work and drove from job site to job during the workday[1] and all were denied pay based on Driveline's pay policies and work practices that operated in violation of the FLSA.  In addition, Plaintiffs' and Defendant's economic experts each opined that there were no significant differences in the work or the damages claimed by the named and opt-in Plaintiffs based on depositions taken before and after the Court's grant of conditional class certification.  Driveline's conduct was willful and violated the minimum wage and overtime provisions of the FLSA.

Driveline argues that this case is unsuitable for collective treatment because Plaintiffs claim to have performed work that they did not report and for which they were not paid by Driveline.  However, Plaintiffs claims are directly attributable to Driveline's Pay Policies and work practices that operate in violation of the FLSA.

First, there is no dispute that Driveline paid Plaintiffs for working only a fixed time ("allotted time") on each project assignment, a time created by Driveline based on the maximum amount Driveline's clients agreed to pay Driveline for the projects assignments to be completed.

---

[1] In their complaint, Plaintiffs sought damages for home to work travel time and for work to home travel time.  Plaintiffs have abandoned these claims because deposition testimony established that Driveline did not require Plaintiffs to perform administrative tasks immediately in advance of undertaking in-store project assignments, and Driveline did not require Plaintiffs to return home immediately after completing their last project assignment in order to perform required administrative tasks.  Driveline has filed a motion for partial summary judgment to dismiss Plaintiffs' home to work and work to home travel-time claims and Plaintiffs do not oppose the entry of an order granting relief.

Driveline did not study or otherwise try to determine how long each project actually took to complete, and Driveline's allotted times included the time Plaintiffs were required to perform administrative work in advance of and after completing project assignments.  Driveline's allotted times pay policy violated the FLSA's requirement that each Plaintiff be paid for all hours they actually worked.

Second, Driveline's payroll system did not permit Plaintiffs to self-report all hours they actually worked, but instead limited Plaintiffs to reporting having worked no more than the maximum allotted time Driveline set for each project.  Moreover, Driveline's payroll system did not at all permit Plaintiffs to self-report the hours they spent working on required administrative tasks, nor did it provide Plaintiffs any way to self-report the time they spent traveling from job site to job site on Driveline's behalf during each workday.  The FLSA required Plaintiffs to be paid for all hours they actually worked and Driveline's payroll system intentionally prevented Plaintiffs from self-reporting all their work hours, thereby denying Plaintiffs pay to which they were entitled for administrative work that they performed and for the time they spent traveling from job site to job site on Driveline's behalf.

Third, Driveline argues that "because Plaintiffs did not report their allegedly unpaid work, their evidence consists solely of estimates . . . based wholly on memory."  Driveline's argument is self-serving at best because Plaintiffs' lost wage estimates are necessary and authorized under the FLSA only because Driveline failed to maintain work records required by the FLSA that would precisely show the hours each Plaintiff worked without pay.

Lastly, Driveline contends that Plaintiffs were not paid for all their work hours because they did not follow Driveline's policy requiring them to seek approval to work on projects in excess of Driveline's allotted times.  Plaintiffs' expert economist reviewed testimony and work

records for 56 Plaintiffs who were deposed and concluded that these Plaintiffs were denied .56 hours pay for each hour they were paid to work by Driveline, an average of 2.8 hours per Plaintiff per workday.

Many Plaintiffs were not fully paid or not paid at all after repeatedly complaining to supervisors about working without pay, while many others believed that complaining to Driveline about unpaid work hours would be futile and simply chose not to complain at all.[2] In either case, what's clear is that Driveline's work approval process is a sham intended to deny Plaintiffs pay for work they performed for Driveline. More importantly, Driveline was required to record and pay Plaintiffs for all hours that they actually worked and did not; the FLSA did not require Plaintiffs to fight a mismatched battle with a major corporation in order to be paid for all the work that they performed.

The evidence establishes that Plaintiffs are similarly situated based on the work that they performed for Driveline. The central issue to be resolved in this case is whether Driveline's Pay Policy and work practices operated to deny Plaintiffs wages in violation of the FLSA, which can be and should be collectively adjudicated. Therefore, Plaintiffs respectfully request that this Court deny Defendant Driveline's motion for decertification and certify this case to proceed to trial as a collective action under the FLSA.

---

[2] Plaintiffs have not made a claim for unpaid in-store work time in this collective action. As Driveline suggests, these claims are highly individualized. The unpaid administrative work time is nearly universal, and varies only by degrees, as does the unpaid or underpaid travel time between stores.

## FACTUAL BACKGROUND

Defendant Driveline Retail Merchandising, Inc. (hereafter "Driveline") provides local in-store marketing and retail marketing services on a national basis for 600 consumer products companies and national retailers.  [See Ex. A, Defendant's Supplemental Responses to Plaintiff's First Interrogatories ("Defendant's Supplement"), p.27, Answer to Interrogatory 13].  To service its clients, Driveline employs thousands of hourly-paid "Merchandisers" throughout the country to work from home and call on retail locations in local territories assigned by Driveline.  [See Id., Answer to Interrogatory 5; Ex. B, Excerpt from the Deposition Transcript of Amit Marty, Driveline's Chief Information Officer, ("Marty Dep.), 38:2-25; 39:6-11; 84:6-8].  The annual turnover rate for Driveline's Merchandisers is 90%.  [See Ex. C, Excerpt from the Deposition Transcript of Lori-Anne Bennett, Driveline's Chief Financial Officer & Executive Vice President of Human Resources, ("Bennett Dep."), 11:3-7].

The named Plaintiffs and those who joined this action by filing consents with the Court (hereafter "Plaintiffs") brought suit against Driveline under the collective provisions of the Fair Labor Standards Act (hereafter "FLSA"), 29 U.S.C. § 216(B).  Plaintiffs allege that Driveline failed to pay them for performing administrative work in advance of and following the completion of the in-store portion of their project assignments.  Plaintiffs also allege that Driveline failed to fully pay them for the time they spent traveling from one store to another on Driveline's behalf during each workday.

### DRIVELINE'S MERCHANDISER POLICIES

Driveline hired the 1,692 Plaintiffs in this action to perform merchandising work in local territories near their homes.  Driveline referred to the Plaintiffs variously as "Merchandiser," "Master Merchandiser," or "Master Merchandiser/Area Coordinator."  These characterizations

by Driveline are distinctions without a difference however, because Driveline has no job description that differentiates the duties and responsibilities of a Master Merchandiser from a Master Merchandiser/Area Coordinator from a mere Merchandiser.  Regardless of job title, Driveline defined the actual duties and responsibilities for all Merchandisers across the country on the basis of only one job description.  [See Ex. D, Merchandiser Position Description – Revised November 2011].

Driveline's Merchandiser Position Description defines the "Basic Duties" of Merchandisers as follows:

> The . . . merchandiser is responsible for correctly completing all merchandising plans on a regular basis.  This includes servicing stores as assigned on the scheduled date and reporting store visits on the same day.  Plan assignments may support any of the following retailers:  mass merchandisers, specialty stores, drug store chains, home stores, dollar stores, grocery, or other retailers.  Plan tasks may include [product] resets, [product] updates, cut-ins, audits, unit integrity updates, display and fixture set-up, seasonal merchandising, stocking and replenishment, order placement, and ongoing service of key accounts.  Depending on the plan, you may be asked to complete one or more of these tasks.

Id.

In addition, Driveline's Merchandiser Position Description provides that all Merchandisers are required to have a reliable computer, a printer, internet access, and an email account because each Merchandiser is required to:  1) download, print, read and acknowledge all project tasks prior to the project start date; 2) review all project materials prior to conducting merchandising activities; 3) download, print and take projects, eReporting worksheets, and all other applicable material included as part of each project on every scheduled store visit; and, 4) complete reporting specified for each project on the same day the project is undertaken.  Id.

5

On September 1, 2011, Driveline implemented a policy entitled "Driveline Conditions of Work Policy," which all Merchandisers were required to read and electronically accept. The Policy stated, in relevant part, that:

- [A]ll completed work orders MUST be entered [into the] Driveline system ON THE SAME DAY THE WORK IS COMPLETED.

- Payroll entry MUST be made and confirmed on the same day the work is completed, as per the above work order entry process.

- Driveline will no longer accept or process any payroll time over the payroll time allotted on [the] work order. First and foremost, that is the only time we are allowed to bill [the] Client, and [we] will no longer accept payroll hours we cannot bill. If there is a circumstance requiring additional time, it must be PREAPPROVED BY YOUR DISTRICT MANAGER, who must IMMEDIATELY notify [the] Regional Manager in writing of the reason and amount of time being approved. No request for additional time will be processed or paid, unless the time was pre-approved, in writing, the same day.

[See Ex. E, Conditions of Work Policy, "Work Order On-Line Completion Process" section, "Work Order Completion Payroll Entry" section, and "Payroll Hours Over Client Plan Hours" section].

## DRIVELINE'S MERCHANDISER WORK PRACTICES

Driveline made project assignments available for Plaintiffs to select by using MapQuest geocoding, which matches the addresses of retailer locations where project work will be done to the addresses of Merchandisers who live in close proximity. [See Ex. B, Marty Dep., 38:2-25; 84:6-8]. Plaintiffs accessed available project assignments[3] by connecting to Driveline's website from their own personal computer. Each project assignment selected by a Merchandiser details

---

[3] Plaintiffs do not claim damages for time spent selecting project assignments on Defendant's website, but rather instead claim damages for administrative work they performed after accepting project assignments.

the requirements for completing the project, the name and address of the retail location where the project work is to be done, the date by which the project must be completed, and the allotted time set by Driveline for the project work to be completed.  [See Ex. A, Defendant's Supplement, p.4, Answer to Interrogatory 1].

Before officially receiving the project assignments they have selected, Driveline requires all Merchandisers to electronically agree to an extensive list of terms and conditions set forth in a document entitled "Terms of Work Acceptance" that includes, in relevant part, the following:

- I am required to complete the work within the time specified [by Driveline] and by the schedule date.

- I am also required to report the completed work, with required work orders and digital photos, with 24 hours of the schedule date.

- Reporting within 24 hours of the schedule date that the work is completed, with required work orders and digital photos, is an essential term of the assignment and a condition for payment.

- In the event I do not report that the work has been completed as required by these terms of acceptance, the work will be reassigned and I will not be paid for this plan.

- I will only work within the time allowed for a given project.  I understand and agree that the time allowed for a given project will include administrative time as well as store time.  I further understand and agree that if additional time is needed to complete a project; such additional time must be pre-approved by my Driveline manager in writing.

- I agree to print and take to the store where the work is to be done all required documents to complete the work. . . .  I further understand and agree that I will not be reimbursed for the cost of any office supplies used by me in connection with work (e.g., printing paper, printer toner, etc.) and that these types of administrative costs are included in the total amount I am to be paid after completion of the work.

- I further understand that Driveline is monitoring my performance relative to quality of work and timely completion/confirmation of the work.  Based on results, Driveline reserves the right to limit visibility to and assignment of work if my performance rating is less than company guidelines and specifications.

See Ex. F, Terms of Work Acceptance, revised December 2011, ¶¶ 1, 2, 3, 5, 8, 9, 10.

After electronically accepting the terms and conditions set forth in Driveline's Terms of

Work Acceptance, Merchandisers are formally assigned the projects they have selected by

Driveline.  See e.g. Ex. G, Excerpt from the transcript of the deposition of Plaintiff Kathleen

Burke ("Burke Dep.") at 102:20-103:2.

## PLAINTIFFS' MERCHANDISING WORK & THEIR CLAIMS

Plaintiffs could not complete their assigned projects without first logging onto

Driveline's website in advance of beginning work on a project assignment.  [See Ex. F, Terms of

Work Acceptance Policy, revised Dec. 2011, ¶9].  Driveline permitted Plaintiffs to log onto its

website via tablet or cell phone, but Plaintiffs invariably logged onto Driveline's website from

home in order to print all of the materials required to complete the project in compliance with

Driveline's Terms of Work Acceptance Policy.  [See Ex. H, excerpt from the transcript of the

deposition of Plaintiff Sandra Ardoin-Johnson ("Johnson Dep."), 35:24-36:13; Ex. I, excerpt

from the transcript of the deposition of Plaintiff Curt Davenport ("Davenport Dep."), 55:23-

56:12; Ex. J, excerpt from the transcript of the deposition of Plaintiff Leigh Ferster ("Ferster

Dep."), 20:14-20; Ex. K, excerpt from the transcript of the deposition of Plaintiff Diane Shaw

("Shaw Dep."), 21:8-17.

After logging onto Driveline's website, Plaintiffs printed each work order they were

assigned to complete, they printed the instructions associated with each work order, they printed

the planogram for each work order[4], a letter from Driveline for each retail store manager

showing that work on the assigned project was authorized, and they printed a work completion

form for the store manager's signature, which was required to be submitted before the

Merchandiser was paid by Driveline.  [See Ex. G, Burke Dep., 27:25-29:20 with exhibit; Ex. L,

---

[4] A Planogram is a diagram showing how each project should look in the store when completed.

excerpt from the transcript of the deposition of Plaintiff Amy Borders ("Borders Dep."), 25:20-26:15; Ex. M, excerpt from the transcript of the deposition of Plaintiff Angelique ("Barlow Dep."), 53:18-54:8; Ex. N, excerpt from the transcript of the deposition of Plaintiff Michael Lamberson ("Lamberson Dep."), 28:21-29:6; Ex. O, excerpt from the transcript of the deposition of Plaintiff Lloyd McRae ("McRae Dep."), 24:23-25:17].  Plaintiffs also routinely received work materials, product marketing materials, and product displays sent to them by Driveline that they were required to store in their homes and transport to retail locations based on project tasks that they were assigned to complete by Driveline.  [See Ex. I, Davenport Dep., 25:24-26:11; Ex. K, Shaw Dep., 40:8-41:2; Ex. L, Borders Dep., 63:21-64:23; 70:17-71-13; 75:10-12].

After completing their pre-visit administrative work, Plaintiffs drove to the retail stores designated by Driveline to complete the in-store portion of their project assignments.  Before 2013, Driveline did not pay Plaintiffs any drive time wages at all for the time they spent traveling from job site to job site in their assigned territories during the workday.  In January 2013, Driveline revised its Terms of Work Acceptance to include payment of wages for store to store travel time.  The revised Terms of Work Acceptance provided, in relevant part, the following:

> I understand and agree that mileage and drive time ("Drive Time") I incur in completing the work will be calculated through the use of a route optimization powered by Google Maps/MapQuest/ other similar mapping services ("route optimization").

[See Ex. P, Terms of Work Acceptance, revised January 2013 ¶7].

After completing the in-store portion of their project assignments each workday, Plaintiffs were again required to log-on to Driveline's website and perform work that included:  1) retrieving each work order associated with in-store work performed that day and completing the questionnaire associated with each work order; 2) uploading the completed work order containing the store manager's signature; 3) uploading the digital photographs taken during the

day associated with each work order; and, in some cases, 4) completing and submitting inventory reports.  [See, Ex. F, Terms of Work Acceptance, revised Dec. 2011, ¶5; Ex. L, Borders Dep., 45:16-46:15; Ex. Q, excerpt from the transcript of the deposition of Plaintiff Robert Pattern ("Patten Dep."), 31:13-32:11; Ex. R, excerpt from the transcript of the deposition of Plaintiff Kathy Kettelkamp ("Kettelkamp Dep."), 40:24-41:22; Ex. S, excerpt from the transcript of the deposition of Plaintiff Jennifer Brodsky ("Brodsky Dep."), 60:8-62:1].

Each project that Plaintiffs were assigned had an allotted amount of time for completion that Driveline designated.  This allotted time was, according to Driveline, the maximum time Driveline was permitted to bill its client for the project work to be performed no matter how long the project actually took to complete, and this allotted project time included the time Plaintiffs spent performing administrative work in advance of or after completing the in-store portion of their project assignments.  [See Ex. F, Terms of Work Acceptance, revised Dec. 2011 ¶3; Ex. G, Conditions of Work Policy, "Payroll Hours Over Client Plan Hours" section].  However, Plaintiffs testified that the time allotted by Driveline to complete each project was barely adequate to cover the time they spent working in-store, much less the additional time they worked on administrative tasks in advance of and after completing the in-store portion of their project assignments.  [See Ex. H, Ardoin-Johnson Dep., 93:12-94:20; Ex. N, Lamberson Dep., 18:17-21:17; Ex. T, excerpt from the transcript of the deposition of Plaintiff Dawn Morgan ("Morgan Dep."), 37:14-39:9; Ex. U, excerpt from the transcript of the deposition of Plaintiff Lori Mott ("Mott Dep."), 49:14-23].

By policy, Driveline required Plaintiffs who believed they needed additional time to complete a project in excess of Driveline's allotted time for the project's completion to seek and obtain prior written approval to perform the excess work from their District Manager and

Regional Manager on the same day the work was to be performed.  [See Ex. E, Conditions of

Work Policy of September 1, 2011, Payroll Hours Over Client Plan Hour Section].  However,

most Plaintiffs first performed work in excess of the allotted time when necessary because

Driveline would not pay them for work on a project assignment unless it was completed and

sign-off for the work was secured from the retail store manager.  [See id., Work Order On Line

Completion Process section].  They then sought payment from their managers for the actual

work they had done.  However, many Plaintiffs were not fully paid or not paid at all after

repeatedly complaining to their manager about working without pay, while many others believed

that complaining to Driveline about unpaid work hours would be futile and simply chose not

complain at all.  [See Ex. I Davenport Dep., 58:18-24; Ex. L, Borders Dep., 56:8-22; Ex. R,

Kettelkamp Dep., 73:11-15; Ex. S, Brodsky Dep., 31:9-11; Ex. T, Morgan Dep., 49:24-50:14;

Ex. BB, excerpt from the transcript of the deposition of Plaintiff Kimberly Smith ("Smith Dep."),

49:9-20].

Driveline did not consider project assignments to be completed until Plaintiffs

electronically filed all required reports, documents and photographs associated with all work

orders completed that workday and self-reported the time they spent working to complete that

day's work orders.  [See Ex. B, Marty Dep., 46:19-25, 47:1-3; Ex. F, Terms of Work

Acceptance, revised Dec. 2011, ¶3].  Consistent with Driveline's Conditions of Work Policy,

numerous Plaintiffs testified that Driveline's payroll system blocked them from reporting any

time they worked on project assignments in-store over Driveline's allotted times.  Others

testified that the payroll system provided no way for them to separately report their

administrative work hours or the time they spent traveling from store to store during the

workday.  [See Ex. K, Shaw Dep., 42:8-23; Ex. S, Brodsky Dep., 24:10-25:11; Ex. T, Morgan

Dep., 37:14-38:16; Ex. V, excerpt from the transcript of the deposition of Plaintiff Renee

Huggins "Huggins Dep.), 40:17-41:5; Ex. W, excerpt from the transcript of the deposition of

Cynthia Cotton ("Cotton Dep."), 47:2-19; Ex. X, excerpt from the transcript of the deposition of

Named Plaintiff Susan Gibbs ("Gibbs Dep."), 61:23-63:1; Ex. Y, excerpt from the transcript of

the deposition of Named Plaintiff Susan Moore ("Moore Dep.), 67:18-68: Ex. Z, excerpt from

the transcript of the deposition of Plaintiff Chrystal Kizer-Thurston ("Kizer-Thurston Dep."),

23:2-11; 4; Ex. AA, excerpt from the transcript of the deposition of Plaintiff Ramona Hurt ("Hurt

Dep."), 31:25-32:17; Ex. CC, excerpt from the transcript of the deposition of Plaintiff Anthony

Perino ("Perino Dep."), 63:25-64:18;

    After reviewing the entirety of the Plaintiffs' depositions taken, Plaintiff's expert

economist, Steven Dripps, Ph.D., opined that on average, Driveline failed to pay Plaintiffs wages

for 2.8 hours per workday for the time they spent completing administrative tasks required by

Driveline before and after working on assigned projects.  [See Ex. DD, Plaintiffs' Expert Report,

p.8, Pay Record Analysis Section].  He further opined that 81 of 91 Plaintiffs (89.0%) whom he

studied had an effective hourly wage rate that fell below the federal minimum wage standard for

the entire time they were employed by Driveline.  [Id. at p.8, Results Section].

    Plaintiffs' expert economist stated that he did not compute Plaintiffs' lost drive-time

wages because the V3 detail reports produced by Driveline showing the stores each Plaintiff

called on each workday did not contain store addresses.  He further stated that he could compute

Plaintiffs' lost drive-time wages using GPS coordinates if Driveline produced the store addresses

associated with its report for all Plaintiffs.  Lastly, Plaintiffs' expert opined that adding unpaid

drive-time wages to the calculations he made for Plaintiffs' unpaid administrative time would

lower the effective hourly wage rate for each Plaintiff and increase the overall ratio of unpaid to

paid time.  [Id. at p.8, Drive Time Between Stores Section].

Based on deposition testimony and other evidence adduced in discovery, Plaintiffs have established that they are similarly situated and that they have been similarly denied pay based on Driveline's pay policies and work practices that operated in violation of the minimum wage and overtime provisions of the FLSA.

## ARGUMENT

**I.  THE PLAINTIFFS IN THIS COLLECTIVE ACTION ARE SIMILARLY SITUATED BECAUSE THEY ALL PERFORMED THE SAME JOB IN THE SAME WAY FOR DRIVELINE, AND THEY WERE SIMILARLY DENIED PAY BASED ON DRIVELINE'S PAY POLICIES AND WORK PRACTICES THAT OPERATED IN VIOLATION OF THE FLSA.**

Congress enacted the Fair Labor Standards Act ("FLSA") in 1938 to eliminate substandard wages and excessive work hours, conditions that were perceived as detrimental to the standard of living and general well-being of workers.  Woodward v. Fed Ex Freight East, Inc., 250 F.R.D. 178, 184 (M.D. Pa. 2008) (citing 29 U.S.C. § 202(a)).  The FLSA mandates that employees be paid for all hours worked at or above the minimum wage standard, which is currently $7.25 per hour.  See 29 U.S.C. § 206.   The FLSA also mandates the payment of additional compensation to employees at the rate of one and one-half times their regular pay rate for all work they perform in excess of forty hours in any one workweek unless the employee is working in an "exempt" position.  See 29 U.S.C. § 207 (a).  In addition, the FLSA provides for the commencement of a cause of action by one or more employees on behalf of themselves and all other similarly situated employees.  See 29 U.S.C. § 216(b).

The FLSA mandates that plaintiffs in a collective action must be "similarly situated" and, to be included, they must affirmatively "opt-in" to the lawsuit by filing written consents with the Court.  Symczyk v. Genesis Healthcare Corp., 656 F.3d 189, 192 (3d Cir. 2011)(citing 29 U.S.C.

§ 216(b)).  Courts typically employ a two stage process to decide whether a suit brought under § 216(b) may move forward as a collective action.  Id.  The Third Circuit has described the initial step "as 'determin[ing] *whether* similarly situated plaintiffs do in fact exist,' while at the second stage, the District Court determines 'whether the plaintiffs who have opted in are in fact similarly situated to the named plaintiffs.'"  Zavalla v. Wal-Mart Stores, Inc., 691 F.3d 527, 536 n.4 (3d Cir. August 9, 2012) (quoting Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010)].

In the first stage, without evaluating the merits of plaintiffs' claims, the court makes a preliminary determination whether the proposed class of employees named in the complaint can be provisionally categorized as similarly situated to the named plaintiffs.  The court will "conditionally certify" the collective class for the purposes of notice and pretrial discovery if the plaintiffs carry their burden at this threshold stage.  Symczyk, 656 F.3d at 192; Williams v. Owens & Minor, Inc., 2009 U.S. Dist. LEXIS 102304 at *8 (E.D. Pa. Oct. 9, 2009).

In the second stage, the court makes a decision on final certification, most often prompted by a motion for decertification by the Defendant at the close of discovery.   To make this decision, courts engage in a "specific factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate member of the collective class."  Lugo v. Farmer's Pride Inc., 737 F. Supp.2d 291, 299 (E.D. Pa. 2010).  On a motion for decertification, "the burden is on the plaintiffs to establish that they satisfy the similarly situated requirement" by a preponderance of the evidence.  Zavala, 691 F.3d at 537.

Although plaintiffs face a higher burden at the decertification stage, "similarly situated" does not mean 'identically' situated."  Martin v. Citizens Fin. Group, Inc., 2013 U.S. Dist. LEXIS 43084 at *8 (E.D. Pa. 2013) (quoting Andrako v. United States Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011)).  Courts evaluate whether the proposed plaintiffs are similarly

situated based on a list of factors that include:

> whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment.  Plaintiffs may also be found dissimilar based on the existence of individual defenses.

Zavala, 691 F.3d at 536-37.  "This list is not exhaustive, and many [other] relevant factors have been identified[,]" including the extent to which members of the proposed class will rely upon common evidence and fairness and procedural considerations.  Id.

To determine whether plaintiffs are similarly situated, courts often first consider the factual and employment settings of the plaintiffs.  Martin, 2013 U.S. Dist. LEXIS 43084, at *8-9 (citing Andrako, 788 F. Supp. 2d at 378).  To weigh in favor of collective treatment, similarities must "extend beyond the 'mere facts of job duties and pay provisions[,] and be viewed in light of the claims asserted.  Id., at *9 (quoting Zavala v. WalMart Stores, Inc., 2010 U.S. Dist. LEXIS 63530, at *7 (D.N.J. 2010)).  "Being similarly situated does not mean simply sharing a common status, . . . [r]ather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."  Id. (quoting Zavala, 691 F.3d at 538).

The second factor often considered is whether the "potential defenses" in the case relate to the class as a whole or will be raised with respect to each individual plaintiff.  Id., at *10 (citing Lugo, 737 F. Supp. 2d at 300-01) (quoting Moss v. Crawford & Co., 201 F.R.D. 398, 409 (W.D. Pa. 2000)).  Individualized defenses prevent an efficient proceeding with a representative class and courts have the discretion to determine whether the presence of individualized defenses will make the case unmanageable as a collective action.  Id.

Lastly, the court may consider whether "fairness and procedural considerations" weigh in favor of proceeding with a collective class.  In its analysis, the court should consider the primary

objectives of FLSA collective actions, which are: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Id. (citing Andrako, 788 F. Supp. 2d at 378) (quoting Lusardi v. Xerox Corp., 118 F.R.D. 351, 359 (D.N.J. 1987)). However, the court must also decide whether it can "coherently manage the class in a manner that will not prejudice any party." Id., at *11. The court's evaluation of these procedural factors should consider whether case management methods such a bifurcation of the trial, the creation of subclasses or the use of representative testimony would help to effectively manage the case. Id., (citing Andrako, 788 F. Supp. at 384).[5]

## A. Plaintiffs are similarly situated because they all performed the same job in the same way based a single Driveline Merchandiser Position Description.

Plaintiffs' performed those job duties as set forth in Driveline's "Merchandiser Position Description, which is the only job description published by Driveline that identifies the duties and responsibilities for Merchandisers nationwide. [See Ex. D, Merchandiser Position Description]. They began each project assignment by downloading and printing documents and materials from Driveline's website needed to complete their projects as mandated by Driveline. [See Ex. F, Terms of Work Acceptance, rev. Dec. 2011, ¶9]. Plaintiffs then generally traveled to multiple retail stores during each workday to complete their assigned projects. [See Ex. G, Burke Dep., 97:7-20; Ex. H, Ardoin-Johnson Dep., 113:11-20; Ex. S, Brodsky Dep., 33:9-14; Ex. T, Morgan Dep., 23:1-11; Ex. EE, excerpt from the transcript of the deposition of Plaintiff Sheryl Myers ("Myers Dep."), 21:16-23; Ex. FF, excerpt from the transcript of the deposition of Plaintiff Maria Minard ("Minard Dep."), 5:12-17; Ex. GG, excerpt from the transcript of the

---

[5] In order to eliminate de minimis claims, class notice in this case was only sent to those Merchandisers identified by Driveline who had been paid wages of more than $1,000.00.

deposition of Plaintiff Roseanne Urbanowski ("Urbanowski Dep."), 77:18-22].  Plaintiffs

performed merchandising work during each workday that included at various times resets,

updates, cut-ins, audits, unit integrity updates, display and fixture set-up, seasonal

merchandising, stocking and replenishment and order placement at mass merchandisers,

specialty stores, drug stores, home stores, dollar stores, grocery stores and other retailers.  At the

end of each workday, Plaintiffs uploaded completed forms, documents, inventory reports and

photographs specified in each project they had completed that day to Driveline on its intranet

system, and they attempted to self-report all their work hours.  However, Plaintiffs were

prevented from reporting work hours that exceeded Driveline's allotted times even if they

actually worked longer.  Plaintiffs are similarly situated based on the work they performed for

Driveline because they only performed work as set forth in Driveline's Merchandiser Position

Description and as mandated under Driveline's Terms of Work Acceptance Policy.

     Driveline contends that Plaintiffs are not similarly situated because some Plaintiffs

performed work as part of a team assigned to work at only one store where a Team Lead was

solely responsible for performing administrative tasks on behalf of the entire team.  However,

this issue concerns damages and not liability.  To the extent any Plaintiff worked on a dedicated

team, that Plaintiff would simply not have damages cognizable in this lawsuit for the time he

spent as a team member.  In addition, work on a dedicated team at one store does not, by itself,

prove dissimilarity because, based on Driveline's Merchandiser Position Description, work done

by merchandisers while part of a dedicated team does not differ in any way from that done by

merchandisers who work alone in a local territory.

     Driveline also claims that Plaintiffs in this action are not similarly situated because some

worked on "resets," which Driveline describes as "large-scale, labor intensive moving and

rearranging of products, store shelves and promotional displays . . . that generally take days and sometimes weeks to complete." [See Driveline Decertification Brief, document 134, p. 9 of 52, ¶2]. This claim by Driveline has no merit and should be rejected for three reasons:  First, Plaintiffs who worked on large-scale "resets" generally performed smaller scale resets much more often while working alone and there is nothing to distinguish work done on a large scale reset from that done on a smaller scale reset.  For example, Plaintiff Kathy Kettelkamp worked on 60 large scale resets and, while working alone, she completed 110 smaller scale resets; Plaintiff Sheryl Myers worked on 34 large scale resets and, while working alone, she completed 98 smaller scale resets;  Plaintiff Robert Patten worked on 51 large scale resets and, while working alone, he completed 182 smaller scale resets; Plaintiff Ramona Hurt worked on 27 large scale resets and, while working alone, she completed 24 smaller scale resets;  Plaintiff Lori Mott worked on 11 large scale resets and, while working alone, she completed 21 smaller scale resets.

Second, Plaintiffs who worked on large scale resets, as a general rule, completed their assigned work in a matter of hours rather than the days or weeks claimed by Driveline in its brief.  For example, Plaintiff Kathy Kettelkamp completed each assigned large scale reset in an average of 4.5 hours; Plaintiff Sheryl Myers completed each assigned large scale reset in an average of 6.4 hours; Plaintiff Robert Patten completed each assigned large scale reset in an average of 5 hours; Plaintiff Ramona Hurt completed each assigned large scale reset in an average of 3.6 hours; and Plaintiff Lori Mott completed each assigned large scale reset in an average of 2.8 hours.  Lastly, large scale reset work represented 15% or less of the total work that most Plaintiffs performed for Driveline.  See Ex. II, V3 Work Detail Report for Plaintiff Kathy Kettelkamp ("Kettelkamp V3 Report"), last page; Ex. JJ, V3 Work Detail Report for Plaintiff Sheryl Myers ("Myers V3 Report"), last page; Ex. KK, V3 Work Detail Report for

Plaintiff Robert Patten ("Patten V3 Report"), last page; Ex. LL, V3 Work Detail Report for

Plaintiff Ramona Hurt ("Hurt V3 Report"), last page; Ex. MM, V3 Detail Report for Plaintiff

Lori Mott ("Mott V3 Report"), last page. Thirdly, as team leads, which most Plaintiffs were for

most resets, they had to perform administrative work as for regular store visits.

Plaintiffs in this action are similarly situated because they all performed the same job

duties based on Driveline's Merchandiser Position description.

**B. The time Plaintiffs worked on Driveline's behalf performing administrative tasks and traveling from job site to job site during the workday are compensable under the FLSA.**

**1. The administrative work that Plaintiffs performed on Driveline's behalf was compensable under the FLSA because it was integral and indispensable to their principal merchandising activities.**

The FLSA requires an employee to be compensated for all hours worked. 29 C.F.R. §

778.223. "Work" is "physical or mental exertion (whether burdensome or not) controlled or

required by the employer and pursued necessarily and primarily for the benefit of the employer

and his business." Tennessee C., I. & R. v. Muscoda, 321 U.S. 590, 598, 64 S. Ct. 698, 88 L. Ed.

949 (1944). See also, Anderson v. Mt. Clemens Pottery, 328 U.S. 680, 691-693, 66 S. Ct. 1187,

90 L. Ed. 1515 (1946). "Hours worked" under the Act includes all time during which "an

employee is required to be on duty or to be on the employer's premises or at a prescribed

workplace…." 29 C.F.R. § 778.223(a). "[W]orking time is not limited to the hours spent in

active productive labor, but includes time given by the employee to the employer even though

part of the time may be spent in idleness," and may include "traveling on the employer's

business or to and from a workplace." 29 C.F.R. § 778.223(b).

In 1947, Congress amended certain provisions of the FLSA with the Portal-to-Portal Act,

which provides, in part, that employers are not obligated to pay employees for the time they

spend "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is to perform," or for the time employees spend on "activities which are preliminary or postliminary to said principal activity or activities."  29 U.S.C. 254(a)(1)&(2).  Thereafter, the Supreme Court concluded that "activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the FLSA if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed . . . ."  Steiner v. Mitchell, 350 U.S. 247, 256, 76 S. Ct. 330, 100 L. Ed. 267 (1956).  "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities."  Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 517, 190 L. Ed. 2d 410 (2014).

In this case, various Plaintiffs testified that the administrative work they did in advance of working in-store on a project included printing each work order they were assigned to complete, printing the instructions associated with each work order, printing the planogram for each work order[6], printing a letter from Driveline authorizing work on the assigned project or projects that each retail store manager was required to sign, and printing a work completion form for each project that each store manager was required to sign as evidence projects had been satisfactorily completed.  [See Ex. G, Burke Dep., 27:25-29:20 with exhibit]; Ex. L, Borders Dep., 25:20-26:15; Ex. M, Barlow Dep., 53:18-54:8; Ex. N, Lamberson Dep., 28:21-29:6; Ex. O, McRae Dep., 24:23-25:17].

---

[6] A Planogram is a diagram showing how each project should look in the store when completed.

After completing the in-store portion of project assignments each workday, Plaintiffs testified that they performed administrative work that included retrieving each work order associated with each in-store project on which they worked that day and completing the questionnaire associated with each work order, uploading the letter of authorization and completed work order containing the store manager's signature, uploading digital photographs taken during the day associated with each work order and, in some cases, completing and submitting inventory reports.  [See Ex. L, Borders Dep., 45:16-46:15; Ex. Q, Patten Dep., 31:13-32:11; Ex. R, Kettelkamp Dep., 40:24-41:22; Ex. S, Brodsky Dep., 60:8-62:1].

All of the administrative work that Plaintiffs performed was integral and indispensable to their principal activities as merchandisers because Plaintiffs could not have been undertaken or completed project assignments without performing required administrative tasks in advance of and following the completion of the in-store portion of their project assignments.  In the 2013 revision to its Terms of Work Acceptance Policy, Driveline described the administrative work Plaintiffs did in advance of and after completing the in-store portion of their project assignments as "essential terms for the work and for payment in connection with the work."  [See Ex. P, Terms of Work Acceptance, revised January 2013, ¶¶1, 4, 5].  Plaintiffs' administrative work was compensable under the FLSA because it was integral and indispensable to Plaintiffs' principal merchandising activities, and this Court should so conclude.

## 2.   The time Plaintiffs spent traveling from job site to job site during each workday was compensable under the FLSA pursuant to the continuous workday rule.

After the Portal-to-Portal Act was enacted, and consistent with the Supreme Court's interpretation of the FLSA, the Department of Labor adopted the continuous workday rule, which provides that "[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be

included in the computation of hours worked as would be required if the Portal Act had not been enacted." 29 C.F.R. § 790.6 (a). The continuous workday rule also mandates that an employee be paid for any walking, riding or traveling time that occurs during a continuous workday after the beginning of the employee's first principal activity and before the end of the employee's last principal activity. 29 C.F.R. § 790.6(a); see also, De Asencio v. Tyson Foods, Inc., 500 F. 3d 361, 370 (3d Cir. 2007)(quoting IBP, Inc. v. Alvarez, 546 U.S. 21, 37, 40, 126 S. Ct. 514, 163 L. Ed. 2d 288(2005)(stating that "during a continuous workday, any [travel] time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [the Portal to Portal Act], and as a result is covered under the FLSA")).

In this case, Plaintiffs generally traveled by car from one retail store to other retail stores each workday in order to complete their project assignments and, on this point, there can be no dispute. Driveline argues, however, that Plaintiffs were not required to travel directly from one store to another during the workday, but instead were free to take care of personal business before proceeding from one store to the next. This argument lacks no merit because the time Plaintiffs spent traveling from one store to the next was integral and indispensable to the performance of their principal merchandising work in-store. Plaintiffs store to store travel time was, therefore, compensable under the FLSA and Plaintiffs were entitled to pay for the time it took them to travel directly from one store to the next during each workday, which is exactly the way Driveline has handled travel time wages since 2013 through the use of route optimization software. The fact that a break occurs in the workday does not change travel time from compensable to not compensable. A break in travel time is no different than occurred when Plaintiffs traveled to home without pay after completing their last in-store project assignment and

22

then performed compensable administrative work in the reports they prepared and filed with

Driveline.  See also Ruti v. LoJack Corp., 596 F.3d 1046, 1061 (9th Cir. 2010)(compensable

activity conducted after the end of the workday is remains compensable although the intervening

commute was not).   The time Plaintiffs spent traveling directly from one retail store to others

each workday is compensable and this Court should so conclude.

  **C. Driveline's Pay Policy and Work Practices operated in violation of the FLSA,
thereby denying Plaintiffs pay for work they performed for Driveline on required
administrative tasks and for time they spent traveling from job site to job on
Driveline's behalf during the workday.**

  Section 11(c) of the FLSA requires employers to keep accurate records to ensure that all

workers are paid the minimum wage for every hour worked.  29 U.S.C. § 211(c).  Regulations

promulgated pursuant to section 11(c) require employers to keep a primary set of records for

each employee, which includes hours worked each workday, and supplementary records, which

include daily starting and stopping time for each employee.  See 29 C.F.R. § 516.2(a)(7); 29

C.F.R. § 516.6(a)(1).  Section 11(c) also prohibits an employer from estimating employee work

hours.  Williams v. Tri-County Growers, 747 F.2d 121, 128 (3d Cir. 1984).

  In Williams, the Third Circuit affirmed the district court's award of unpaid minimum

wages under the FLSA, finding that the employer had violated Section 11(c) of the FLSA by

recording estimated hours rather than the actual hours worked by its employees.  The Court also

found that the employer's pay records were inaccurate in violation of the FLSA because the

employer failed to record instruction periods as hours worked.  Id.

  In this case, Plaintiffs have testified that they were not paid by Driveline for the

administrative work they performed in advance of and after completing the in-store portion of

their project assignments and that they were not paid for their travel-time from job site to job

during each workday.  See Ex. N, Lamberson Dep., 27:19-28:15; Ex. S, Brodsky Dep., 34:14-

35:18; Ex. T, Morgan Dep., 35:22-36:18; Ex. U, Mott Dep., 49:14-23; Ex. BB, Smith Dep.,

31:13-32:20-34:6; Ex. CC, excerpt from the transcript of the deposition of Plaintiff Anthony

Perino ("Perino Dep."), 41:5-25, 42:5-22; Ex. GG, excerpt from the transcript of the deposition

of Plaintiff Roseanne Urbanowski ("Urbanowski Dep."), 43:16-44:17, 44:24-45:15; Ex. HH,

excerpt from the transcript of the deposition of Plaintiff Janet Parker ("Parker Dep."), 9:24-

10:23; Ex. NN, excerpt from the transcript of the deposition of Plaintiff Cathy Herford ("Herford

Dep."), 37:4-8;  Others testified that the payroll system provided no way for them to separately

report their administrative work hours or the time they spent traveling from store to store during

the workday.  And, consistent with Driveline's Conditions of Work Policy, still other Plaintiffs

testified that Driveline's payroll system blocked them from reporting any time they worked on

project assignments in-store over Driveline's allotted times.    [See Ex. K, Shaw Dep., 42:8-23;

Ex. S, Brodsky Dep., 24:10-25:11; Ex. T, Morgan Dep., 37:14-38:16; Ex. V, Huggins Dep.,

40:17-41:5; Ex. W, Cotton Dep., 47:2-19; Ex. X, Gibbs Dep., 61:23-63:1; Ex. Y, Moore Dep.,

67:18-68: Ex. Z, Kizer-Thurston Dep., 23:2-11; 4; Ex. AA, Hurt Dep., 31:25-32:17; Ex. CC,

Perino Dep., 63:25-64:18;

 Driveline has offered no evidence to rebut Plaintiff's testimony regarding the operation of

its payroll system, but instead says that all Merchandisers are paid for administrative work that

they perform as part of the time allotted by Driveline for completing in-store project tasks.  This

practice is exactly that which the Court in Williams, supra, condemned.   Nearly to a person,

Plaintiffs testified that Driveline's allotted times were inadequate to complete administrative

tasks.  For its part, Driveline acknowledges that it did not establish allotted times by studying the

time required for Merchandisers to complete in-store project tasks, nor did Driveline study the

time required by Merchandisers to complete their required administrative tasks before setting

allotted times.  Rather, allotted times represent the maximum time each client is willing to pay Driveline for completing a project task based on negotiations between Driveline and its clients. [See Ex. E, Conditions of Work Policy, "Payroll Hours Over Client Plan Hours" section].

More importantly, Driveline has no payroll records to support its claim that Plaintiffs were paid for the administrative time they actually worked.  Driveline also has no payroll records for Plaintiffs job site to job site travel time because Driveline did not pay Merchandisers at all for in-territory travel time until January 2013. [See Ex. P, Terms of Work Acceptance, revised January 2013].  Driveline acted in violation of the FLSA's record keeping requirements by failing to keep records detailing Plaintiff's daily administrative work and travel time, and this Court should so conclude.

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-88, 90 L. Ed. 1515, 66 S. Ct. 1187 (1946), the Supreme Court determined that an employee should not be penalized and an employer benefitted by the employer's failure to comply with its duty under Section 11(c) of the FLSA to maintain accurate records.   The Court recognized that the employee has

> . . . the burden of proving that he performed work for which he was not properly compensated.  The remedial nature of [Section 16(b) of the FLSA] and the great public policy it embodies, however, militate against making that burden an impossible hurdle for the employee.

Id. at 687.  Once an employee establishes that the employer's records are inadequate, the employee need only introduce enough evidence to support a reasonable inference of hours worked.  Id.  The burden then shifts to the employer to come forward with evidence to negate "the inference to be drawn from the employee's evidence."  Id. at 687-88.

Here, Plaintiffs allege that Driveline failed to pay them for performing administrative work and traveling from job site to job site each workday.  For its part, Driveline has produced no records showing that any Plaintiff was paid at all for performing required administrative tasks

25

or for in-territory job site to job site travel.  Plaintiffs testified as to the time they worked on

administrative tasks without pay and Plaintiffs' expert concluded that Driveline failed to pay

them an average of 2.8 hours per workday for administrative work they performed.  Plaintiffs

also testified as to the time they spent traveling from job site to job site on Driveline's behalf

without pay.  Plaintiffs' expert, however, did not attempt to calculate Plaintiffs lost travel-time

wages because, even though Driveline keeps the data that Plaintiffs' expert needs, Driveline has

so far not produced the records that would enable him to do so.

In this case, it is beyond dispute that Driveline failed to maintain work records mandated

under the FLSA and Driveline has not come forward with evidence to negate Plaintiffs'

testimony as to the hours they worked without pay on Driveline's behalf.  Therefore, this Court

should conclude that Plaintiffs' testimony and documentary evidence supports a reasonable

inference that Plaintiffs performed work and were similarly denied pay in violation of the FLSA

based on Driveline's Pay Policy and work practices.

**D.** **Individual defenses and procedural considerations do not weigh against collective adjudication of the critical issue in this case – whether Driveline's pay policy and work practices caused Plaintiffs to be denied pay in violation of the minimum wage and overtime provisions of the FLSA.**

**1.  Individual Defenses**

Driveline contends that liability in this case can only be determined based on individual

inquiry of each Plaintiff, which it claims cannot be efficiently done at trial on a class-wide basis.

To ascertain liability, Driveline argues that it must make inquiry of each Plaintiff as to the hours

each claims to have worked in excess of hours paid; whether each Plaintiff had knowledge of the

work-time preapproval policy; and whether the time each Plaintiff claims to have worked in

excess of the time they reported was known by Driveline.

In <u>Andrako v. United States Steel Corp.</u>, 788 F. Supp. 2d 372 (W.D. Pa. 2011), the Defendant, like Driveline, argued against collective class certification based on individualized defenses resulting from alleged factual and employment differences among the plaintiffs.  The Court rejected Defendant's argument, first noting that Defendant's individual defenses were not unique to a specific plaintiff but rather would be asserted against all class members, even if the defenses would vary based on individual circumstances.  The Court found that nothing about the collective form would prevent the Defendant from raising its defenses because it would be free to present evidence of lawful employment policies and practices, cross-examine individual representative plaintiffs, and to call others with material testimony helpful to Defendant's case. <u>Id.</u> at 382 (citing <u>Wilks v. Pep Boys</u>, 2006 U.S. Dist. LEXIS 69537, 2006 WL 2821700 at *3 (M.D. Tenn. 2006); <u>Jordan v. IBP, Inc.</u>, 542 F. Supp. 2d 790, 813-14 (M.D. Tenn. 2008).  The <u>Andrako</u> Court also found that "requiring the court to apply similar defenses in 254 separate trials as opposed to against plaintiffs within the collective action hardly promotes efficiency." <u>Id.</u>  <u>See also</u> <u>Moss v. Crawford & Co.</u>, 201 F.R.D. 398, 411 (W.D. Pa. 2000) (even though applicability of the statute of limitations defense turned on the background and knowledge of each individual plaintiff, performing the analysis in seventy separate lawsuits would be inefficient us of court's time); <u>Frank v. Gold'n Plump Poultry, Inc.</u>, 2007 U.S. Dist. LEXIS 71179, 2007 WL 2780504, at *4 (D. Minn. 2007) (defenses did not defeat collective action even though application of defenses to different groups of plaintiffs would turn, in part, on facts that vary among plaintiffs).

The <u>Andrako</u> Court also determined that "many of Defendant's alleged individual defenses relate primarily to damages – *i.e.*, how much uncompensated overtime Defendant allegedly owes to each Plaintiff."  <u>Id.</u>  The Court found that individual damages did not preclude

collective adjudication of the critical issue in the case – whether Defendant employed "an improper practice that was formulated centrally and resulted in uncompensated overtime." Id. at 382-83 (quoting Hill v. Muscogee County Sch. Dist., 2005 U.S. Dist. LEXIS 35725, 2005 WL 3526669, at *4 (M.D. Ga. 2005). The Court further found that "[n]ot only does the alleged single policy or plan in this case outweigh any individualized defenses to damages, but such defenses can be managed easily and fairly, if necessary, through the use of bifurcation, subclasses, representative testimony, or other procedural mechanisms." Id. at 383.

Here, this Court should reject Driveline's individualized defenses argument because, as in Andrako, the critical issue in the instant case is whether Driveline's Pay Policy and work practices operated to deny Plaintiffs wages in violation of the FLSA. Determining collectively whether Driveline's Pay Policy and work practices operated in violation of the FLSA outweighs any individual defenses Driveline may wish to pursue, particularly as to damages, which can be easily and fairly managed through bifurcation, subclasses, representative testimony or other procedural mechanisms.

Driveline, in an effort to bolster its individualized defenses argument, submitted an affidavit from its Chief Information Officer, Amit Marty. [Driveline Ex. 66]. In his affidavit, Mr. Marty references electronic records he secured showing when merchandisers logged onto Driveline's intranet in an attempt to discredit the testimony of several individual Plaintiffs who testified that they logged onto Driveline's intranet in the morning or the evening each workday. However, neither these electronic records nor printouts of them were disclosed to Plaintiffs during discovery nor pursuant to Rule 26. Despite Driveline's attempt at "trial by surprise," Mr. Marty's affidavit is contradicted in a number of respects by V3 Detail Reports that Driveline produced for those Plaintiffs who were scheduled to be deposed.

28

Driveline's V3 Detail Reports shows each project assignment that each merchandiser completes.  A column in the V3 Report entitled "Payroll Entry" shows the date that merchandisers self-reported work hours after completing a project as required by Driveline's Terms of Acceptance Policy.  The V3 Report, under the column heading "Signoff Date, also shows the date that signoff approving work on the project was obtained from the retail store manager where work on the project was done.  Driveline's payroll system will not accept any payroll entries by a merchandiser until all of the information required by the project has first been uploaded to Driveline.  [See Ex. B, Marty Dep., 73:22-74:5, 104:9-22].

In his affidavit Mr. Marty made a number of statements that are contradicted by Driveline's V3 Detail work records.  Mr. Marty's statements are in italics and the data from the V3 Detail work records are in standard font:

- *Kathleen Burke worked on May 18, 2013, but did not log in.*

  ➢ Ms. Burke did not work on May 18, 2013; she worked on May 17, 2013 and May 20, 2013.  [See Ex. NN, p.1 Burke V3 Detail Report excerpt].

- *William Rihel did not log-in on February 5, 2015, February 26, 2015 nor on March 12, 2015.*

  ➢ On February 5, 2015, Mr. Rihel logged onto Driveline's intranet and self-reported hours worked after completing 10 project assignments; on February 26, 2015, he self-reported payroll information after completing 2 projects; and, on March 12, 2015, he self-reported payroll information after completing 5 projects.  [See Ex. NN, p.2, Rihel V3 Detail Report excerpt].

- *Christopher Karver did not log-in on March 14, 2012, March 21, 2012, April 17, 2012, and/or June 7, 2012.*

  ➢ On March 14, 2012, Mr. Karver logged onto Driveline's intranet and self-reported payroll information after completing 1 project; he did not log-in on March 21, 2015; and, he logged on and self-reported payroll information on April 17, 2012, and June 8, 2012 respectively after completing project one day earlier, as was permitted under Driveline's Terms of Work Acceptance Policy of December 2011, which provided that projects had to be reported within 24 hours of being completed.  [See Ex.F, Terms of Work Acceptance, rev. Dec.

2011, ¶3; Ex. NN, p.3 Karver V3 Detail Report excerpt, p1).

Based upon the above analysis, Mr. Marty's affidavit should be disregarded, or at least heavily discounted, by this Court.

### 2.  Fairness and Procedural Considerations

Driveline also argues that fairness and procedural considerations owing to factual disparities between Plaintiffs weighs against trying this case as a collective action.

The Defendants in Andrako, as in Driveline, argued for decertification based on fairness and procedural considerations.   The Andrako Court again rejected the Defendant's argument, finding that fairness and procedural considerations weighed heavily in favor of the plaintiffs because decertification would result in more than 250 individual trials, "the worst possible outcome in terms of efficiency."  Id. at 383.  Decertification, the Court noted, would also place each opt-in Plaintiff back at square one without the benefit of pooled resources to resolve" the common liability questions in the case.  Id. (citing Plewinski v. Luby's Inc., 2010 U.S. Dist. LEXIS 39179, 2010 WL 1610121, at *6 (S.D. Tex. 2010)(quoting Kautsch v. Premier Commc'ns, 2008 U.S. Dist. LEXIS 7219, 2008 WL 294271, at *4 (W.D. Mo. 2008)); Wilks, 2006 U.S. Dist. LEXIS 69537, 2006 WL 2821700, at *8 (where plaintiffs challenged some common pay practice, "any requirement that each plaintiff prove his or her claims individually would waste more judicial resources than trying their cases individually would preserve).  Such a result, the Court found, would be contrary to the policy behind collective actions under the FLSA – allowing plaintiffs to vindicate their rights by resolving in one proceeding common issues of law and fact arising from the same improper practice.  Id.  See Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) ("As a practical matter, Plaintiffs can hardly be expected to pursue these small claims individually, so there is little likelihood that their rights

will be vindicated in the absence of a collective action").

Plaintiffs' expert economist found that 100% of the Plaintiffs whose depositions he examined had some weeks during which their wages fell below minimum and more will be found when Plaintiffs' travel time are calculated.  The reality, however, is that most individual damage claims for Plaintiffs will result in actual damages measured in hundreds, not thousands of dollars.  To the members of this class, these claims are significant.  Should Driveline's motion be granted, few lawyers would risk representing such a class of Plaintiffs, much less their individual claims.  Such a result would make the statutory federal minimum wage a fiction.  As did the <u>Andrako</u> Court, this Court should reject Driveline's argument with respect to fairness and procedural considerations.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs submit that they have met their burden and demonstrated by a preponderance of evidence that the named Plaintiffs and opt-in Plaintiffs are similarly situated.  Therefore, Plaintiffs respectfully request that this Court deny Defendant Driveline's motion for decertification and certify this case to proceed to trial as a collective action under the FLSA.

Respectfully submitted,

PAUL, REICH & MYERS, P.C.

By:   **/s/ Richard P. Myers**
Richard P. Myers
Attorney for Plaintiffs

Dated:  July 24, 2017

31